UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

A.L.S. ENTERPRISES, INC.,

        Plaintiff,

v.                                      Case No. 1:14-CV-500

ROBINSON OUTDOOR               HON. GORDON J. QUIST
PRODUCTS, LLC,

        Defendant.
_____/

### OPINION REGARDING PLAINTIFF'S AND DEFENDANT'S POST-TRIAL MOTIONS

      Plaintiff, A.L.S. Enterprises, Inc. (ALS), sued Defendant, Robinson Outdoor Products, LLC (Robinson), for false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging that Robinson made false or misleading statements of fact regarding Robinson's Trinity scent-control hunting clothing.  The parties tried the case to a jury from May 10, 2016, through May 19, 2016.  At the conclusion, the jury returned a verdict for ALS, finding that ALS had proved its false advertising claims as to the three advertising statements at issue.  The jury awarded ALS $1.3 million in lost profits plus $2 million in damage control costs, and found that ALS is entitled to disgorgement of Robinson's profits in the amount of $500,000.  Finally, the jury said that Robinson acted willfully.  (ECF No. 209.)

      Robinson has filed a combined motion for: (1) judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50; (2) an equitable adjustment of the jury award pursuant to 15 U.S.C. § 1117(a); and/or (3) a new trial pursuant to Federal Rule of Civil Procedure 59.  ALS has filed the following motions: (1) motion for preliminary injunction; (2) motion for enhanced

damages; and (3) motion for attorney's fees and prejudgment interest. The motions are fully briefed and ready for decision.

For the reasons set forth below, the Court will grant Robinson's motion for judgment as a matter of law and, alternatively, grant Robinson's motion for a new trial. In addition, the Court will grant ALS's motion for a permanent injunction but will deny ALS's motions for enhanced damages and attorney's fees and prejudgment interest.

## I. BACKGROUND

ALS and Robinson are competitors in the scent-control hunting products market. Both companies sell scent-control clothing designed to mask human scent or odor from animals, and market their products primarily to bow hunters. ALS markets its products under the Scent-Lok brand name, and Robinson markets its products under the ScentBlocker brand name. ALS and Robinson share many of the same retail customers, including so-called big-box retailers Cabela's, Gander Mountain, and Dick's Sporting Goods.

ALS owns a patent that relates to carbon-based scent-control hunting clothing, pursuant to which ALS makes and sells carbon hunting clothing. ALS licensed its carbon technology to Robinson from 1997 until late 2012, during which time both parties sold carbon scent-control clothing.

In 2011 or 2012, Robinson began to investigate using synthetic polymers as an alternative to carbon for an adsorbent. Robinson eventually settled on a product called Macronet and terminated its license with ALS, electing to focus solely on clothing containing its Macronet technology, which Robinson named "Trinity." In August 2012, Robinson retained Dr. Roger Pearson of Aspen Research Corporation to perform a static adsorption test using the same size pieces of fabric containing four different adsorptive technologies: Macronet (Trinity); Robinson's Cold Fusion carbon product; ALS's carbon product; and Zeolite—a material used in Under Armour

2

scent-control clothing.  Using butyric acid to mimic human scent, Dr. Pearson designed the test to measure the uptake of butyric acid in each fabric sample over various time intervals that concluded at 144 hours.  Dr. Pearson reported the raw data from his test in report A47053.  (PX 142B.)[1]  Based on the data from A47053, Robinson performed an additional calculation designed to further compare the technologies and isolate for the adsorbent by dividing the amount of butyric acid adsorbed by the weight of each different fabric sample.  (DX 50.)

The Trinity product that Robinson ultimately commercialized contained significantly less Macronet than the Trinity fabric sample Aspen tested in A47053.  Whereas the Trinity fabric tested in A47053 had a Macronet loading of 40 grams per square meter, the Macronet loading on the commercialized Trinity fabric was 6.25 grams—one-sixth of the loading used in  A47053.  (ECF No. 233 at PageID.2055–56.)

In the fall of 2012 and continuing through 2014, Robinson pitched its Trinity products to Cabela's, Gander Mountain, and Dick's in various presentations.  The materials that Robinson presented to these retailers included the following statements or claims: (1) 1 ScentBlocker Jacket with Trinity has the scent adsorbing capacity of 3 Scent-Lok jackets with carbon alloy and 8 Under Armour jackets with Zeolite (the 8-3-1 claim); (2) activated carbon technology has 44% of the odor adsorption capacity of the Trinity technology (the 100-44 claim); and (3) Trinity technology adsorbs up to 40% more odor than carbon and up to 200% more than Zeolite (the 40/200 claim).  (*See*, *e.g.*, PX 150, 159B, 165B.)  The same materials also said that Trinity technology allowed for lighter loading of the adsorbent, making possible lighter fabrics and designs with adequate adsorption. (*See*, *e.g.*, PX 150, 159B.)  The 8-3-1 and 100-44 claims were made only to Cabela's, Gander

---

[1] ALS's trial exhibits will be referred to herein as "PX __" and Robinson's trial exhibits will be referred to as "DX __."

3

Mountain, and Dick's, while the 40/200 claim was made to all of Robinson's retail customers and to consumers.

In March 2014, Robinson engaged Aspen to perform another test using the same methodology employed in test A47053, but this time using commercialized Robinson Trinity and ALS carbon products. (ECF No. 240 at PageID.2424–25, 2620.) Robinson ordered the test to determine the validity of ALS's national ad campaign stating that Scent-Lok products were 16 times more effective than ScentBlocker products. (*Id.* at PageID.2495.) The results of the test, identified as A48444, showed that ALS's and Robinson's products performed at about the same level. (*Id.* at PageID.2629.)

## II. DISCUSSION

### A. Robinson's Motion

#### 1. Motion for Judgment as a Matter of Law

Robinson argues that it is entitled to judgment as a matter of law because ALS failed to present sufficient evidence to establish the requisite elements of its false advertising claim as to each of the asserted advertising claims.

A court confronted with a motion for judgment as a matter of law must decide "whether there is sufficient evidence to raise a question of fact for the jury." *Warkentien v. Vondracek*, 633 F.2d 1, 6 (6th Cir. 1980). The inquiry for resolving a Rule 50 motion is essentially the same as that for resolving a Rule 56 motion for summary judgment. *White v. Burlington N. & Santa Fe Ry Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000)). The Sixth Circuit describes the district court's analysis as follows:

> In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its judgment for that of the jury. Rather the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the

4

opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.

*Ratliff v. Wellington Exempted Vill. Schs. Bd. of Educ.*, 820 F.2d 792, 795 (6th Cir. 1987) (citations omitted).

To prove a claim of false advertising under the Lanham Act, a plaintiff must establish that

1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). Where, as here, several statements are at issue, a court must assess each statement independently. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247–48 (11th Cir. 2002). As for the first element, a plaintiff who seeks an award of damages may prove either that the statement "is literally false or that it is true yet misleading or confusing."[2] *American Council*, 185 F.3d at 614. If a statement is literally false, deception is presumed, *i.e.*, the plaintiff need not introduce evidence that consumers perceived the statement in a misleading manner. *Id.*; *see also Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735 (6th Cir. 2012) (noting that "where statements are literally false, a violation may be established without evidence that the statements actually misled consumers"). If a statement is ambiguous or true but misleading, the plaintiff must present proof of actual deception. *American Council*, 614 F.3d at 614.

A statement can be literally false either explicitly or by "necessary implication." *Innovation Ventures*, 694 F.3d at 735–36 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002)). The "necessary implication"

---

[2]The fourth element—that the advertisements were introduced in interstate commerce—is not at issue.

doctrine encompasses the so-called "establishment claim," which permits a plaintiff to prove literal

falsity based on product testing.  *See FLIR Sys., Inc. v. Sierra Media, Inc.*, 903 F. Supp. 2d 1120,

1129 (D. Or. 2012) (describing establishment claims as a "subspecies of the false by necessary

implication doctrine").  When an establishment claim is at issue, a plaintiff may prove literal falsity

"by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product

is superior," or by showing that "the tests, even if reliable, do not establish the proposition asserted

by the defendant."  *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992).  When a

plaintiff seeks to prove literal falsity through an establishment claim, the defendant must identify

the tests that support its advertising statement.  *Id.*

### a.    8-3-1 and 100-44 Claims

Robinson admits that the 8-3-1 and 44-100 claims were literally false. (ECF No. 225 at

PageID.1761–63.)  Therefore, while ALS was thus not required to present evidence that these

statements actually deceived the retailers, it was still required to show both that these statements

were material to the retailers' purchasing decisions and that there was a causal link between these

statements and some harm.  ALS failed to do so for both elements.  First, as to materiality, while

both statements could influence a purchasing decision because they suggest that Trinity adsorbed

more odor than activated carbon technology, both statements were always presented together to the

retailers, who were sophisticated buyers, and oftentimes appeared in materials near the 40/200 claim.

Given that these statements were mathematically at odds with one another, it is implausible (without

testimony from the retailers) that sophisticated and knowledge retail buyers would have relied on

either statement.[3]   As for harm, ALS failed to offer any evidence sufficiently linking these statements to any retailer's purchasing decision.[4]

> **b.     The 40/200 Claim**

In contrast to the 8-3-1 and 100-44 claims, the 40/200 advertising claim was made to both retailers and consumers.   Because ALS proceeded on the theory that the 40/200 claim was an establishment claim, a substantial portion of the evidence at trial focused on whether the tests supporting this claim were reliable and, in fact, supported the claim.

> **i.     The Evidence Established That the Claim is Literally True**

To support its 40/200 claim, Robinson relied on Aspen's August 2012 test and the results reported in A47053, as well as the additional calculations that Robinson performed in house based upon Aspen's test results.   Robinson presented testimony from Dr. Pearson to explain the test results.   Dr. Pearson confirmed that although there is no industry-standard test to measure adsorptive capacity of fabrics, the testing methodology he used was an appropriate way to compare adsorption among different types of materials over time and that butyric acid was an appropriate compound to

---

[3]ALS's only evidence pertaining to the materiality of these claims is that, according to minutes of an October 25, 2012, meeting, Dave Steiner of Gander Mountain was impressed with a slide stating "9 UA Garments, 2.3 [Scent] Lok Garments = 1 Trinity Garment," (PX 281) and that in a subsequent email, Steiner thanked Robinson for "a well-prepared and productive meeting" and said that Robinson "truly ha[d] innovation that changes the game." (PX 226.) Such evidence is insufficient to support a finding of materiality. The fact that Steiner was impressed with a single slide out of many that were presented does not establish that such slide actually influenced subsequent buying decisions. This is particularly true in light of the fact that Robinson was marketing its Trinity technology as something new that allowed for more flexible, less bulky fabrics made possible by "[l]ighter [adsorbant] loading . . . with good adsorption," (PX 159B), which very well may have been the basis for Gander Mountain's purchase decisions. ALS cites no evidence as to how Cabela's perceived the 8-3-1 and 44-100 statements and, because Dick's did not purchase less clothing from ALS as in prior years, there is no reason to conclude that those statements had any effect on Dick's.

[4]Regarding Cabela's, ALS argues that after being shown the 8-3-1 and 100-44 slides, Cabela's ordered Trinity fabric for use in its in-house products and also ordered some Trinity hunting apparel. (ECF No. 232 at PageID.1874 (citing PX 228 and 229).) However, "inferences of causation based solely on the chronology of events" cannot alone establish a link to harm "where the record contains . . . other equally credible theories of causation." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1388 (5th Cir. 1996). Because Robinson was marketing its Trinity product as something new that allowed use of lighter, more flexible fabrics, it is equally plausible that these features, rather than the 8-3-1 and 100-44 statements, influenced Cabela's purchasing decisions. However, the jury never heard from Cabela's representatives.

mimic human odor. (ECF No. 240 at PageID.2614, 2617.) Dr. Pearson also testified that the testing methodology he used was scientifically valid and that the results he obtained are verifiable. (*Id.* at PageID.2621.) ALS offered no expert testimony of its own to rebut Dr. Pearson's testimony on these points.

Robinson also had Dr. Pearson perform a series of basic calculations, based on the raw data reported in A47053, to demonstrate that Trinity performed up to 40% better than ALS's carbon technology during the first 7.5 hours. These calculations showed that Trinity adsorbed 30% more butyric acid than carbon at two hours, 43% more than carbon at four hours, and 36% more than carbon at seven and one-half hours. (*Id.* at PageID.2617.) Dr. Pearson thus confirmed that the data reported in A47053 supported Robinson's claim that Trinity adsorbs up to 40% more than carbon, at least during the during the first 7.5 hours. Finally Dr. Pearson testified that the additional calculations that Robinson did to "normalize" the results in A47053 for the weight of the fabric could be appropriate in circumstances where the weight of the adsorbent is unknown. (*Id.* at 2618.)

Dr. Pearson's testimony and the data reported in A47053 establish that the 40/200 claim is literally true because it supports Robinson's ad claim that Trinity technology adsorbs up to 40% more than ALS's carbon-based technology during the first 7.5 hours of use. Robinson's additional calculations (dividing the uptake by the weight of the fabric), which Dr. Pearson said could be appropriate where the weight of the adsorbent was unknown, further support the 40/200 claim.

ALS argues that the jury could have rejected Robinson's reliance on A47053 because the prototype tested in A47053 was never commercialized, and the Trinity product that Robinson eventually brought to market contained less than one-sixth the Macronet used on the fabric sample in A47053. ALS argues, therefore, that this case essentially involves a "bait and switch," and test A48444, which was performed on commercialized Trinity products, is evidence that the 40/200 claim is literally false. However, it is undisputed that A47053 and A48444 tested different things.

A479053 compared technologies, while A48444 (performed eighteen months later) used the same methodology to compare products.  Because the 40/200 claim always referred to "Trinity Technology," A48444 is not evidence of literal falsity.[5]  ALS also makes a number of other arguments as to why a jury could reject Robinson's assertion that the 7.5 hour period was most relevant to hunters, including that Aspen took measurements at 24, 48, 120 and 144 hours and Robinson told users of its garments to regenerate them after 20 hours of use.  These arguments fail, however, because the 40/200 claim does not specify any particular period of time.[6]

ALS also argues that the jury could have rejected Robinson's rationale for "normalization" of the results of A47053 for a number of reasons.  (ECF No. 232 at PageID.1866–87.)  But even assuming that the jury had a proper basis to reject Robinson's in-house calculations as supporting the 40/200 claim, it still remains true that A47053 supports the 40/200 claim.[7]

### ii. ALS Established Actual Deception as to Consumers, But Not Retailers

Because the 40/200 claim was literally true but misleading or ambiguous, ALS was required to present sufficient evidence of actual deception.  *American Council*, 185 F.3d at 616.  ALS presented sufficient evidence on this element as to consumers through the testimony of its consumer

---

[5]For these same reasons, *Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*, 829 F. Supp. 2d 802 (D. Minn. 2011), *Campagnolo, S.R.L. v. Full Speed Ahead, Inc.*, No. C08-1372 RSM, 2010 WL 1903431 (W.D. Wash. May 11, 2010), and *Pennzoil-Quaker State Co. v. Smith*, No. 05-1505, 2008 WL 4107159 (W.D. Pa. Sept. 2, 2008) (adopting Mar. 7, 2008 report and recommendation), which ALS cites for the proposition that statements made about a product that was never sold can be literally false, are distinguishable from the instant case.

[6]ALS also argues that A47053 is literally false because it does not support the 200% part of the 40/200 claim with regard to Zeolte.  ALS argues that this part of the claim is false as to ALS because its products contain some Zeolite. However, ALS holds a patent on carbon scent-control hunting products and markets its products as carbon-based products.  ALS failed to present any evidence that the 200% portion of the claim targeted ALS's products or caused any harm to ALS.

[7]ALS argues that, rather than simply performing additional calculations, Robinson manipulated the test data by omitting all Aspen data taken at 120 and 144 hours and the test data for Robinson's Cold fusion product, and by fabricating results at 38 hours.  (ECF No. 232 at PageID.1867.)  ALS also notes that Robinson made other false statements about its calculations, such as that they were based on "independent lab test results" and "done to ASTM standard procedures."  None of those statements concern the results in A47053, nor were they included in the 40/200 claim.

survey expert, Dr. Maronick.  Although the Court excluded portions of Dr. Maronick's consumer survey pertaining to materiality, it admitted other portions.  In particular, Dr. Maronick testified, that, among other things, many consumers interpreted the 40/200 claim as referring to the product itself—meaning that the ScentBlocker product itself allowed a hunter to get closer to a deer because it adsorbed more odor and that it adsorbed or "blocked" more odor than carbon-based products. (ECF No. 240 at PageID.2513.)  Dr. Maronick also said that around 70 percent of respondents thought that the "up to 40 percent odor claim" meant that the product's superior adsorption would last the whole time hunting and not just up through 7.5 hours.  (*Id.* at PageID.2514.)  Such evidence was sufficient for the jury to find that the 40/200 statement actually deceived consumers.

As for retailers, ALS presented no survey evidence, nor did any witness from Cabela's, Gander Mountain, or Dick's testify that they were deceived by the 40/200 claim.  ALS's only evidence of retailer deception consisted of a few isolated statements from a Cabela's catalogue and from Gander Mountain's webpage adopting the 40/200 claim for the proposition that Trinity enhanced garments provide more and longer odor adsorption than activated carbon scent-control fabrics.  (PX 182, 293.)  While such evidence does tend to show that two retailers were deceived, it is insufficient to show that a "'significant portion' of the [retailer] population was deceived." *American Council*, 185 F.3d at 616.  ALS presented no evidence that Dick's was actually deceived, and it is undisputed that all ALS customers "of any significance" received the 40/200 ad claims. (ECF No. 240 at PageID.2574.)  The fact that two out of many retailers were deceived is insufficient for ALS to meet its burden of proving actual deception.  *See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 133–34 (3d Cir. 1994) (concluding that confusion of 7.5% of the intended audience was insufficient to show that advertising deceived "a substantial portion of the intended audience" (internal quotation marks omitted)); *see generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:193 ( 4th ed. 2015)

("Courts have found survey figures to be sufficient when they revealed that 15%, 20%, 21% to 34%, 'over 25%,' and 33% of respondents received a misleading message from the ad.") (footnotes omitted).

### iii.    ALS Established Materiality as to Consumers, But Not Retailers

Because the Court excluded the portion of Dr. Maronick's consumer survey pertaining to materiality, ALS was required to prove materiality to consumers by another path.  *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110–11 (9th Cir. 2012) (noting that "materiality in false advertising claims is 'typically' proven through consumer surveys," but "nothing in the Lanham Act, nor under our precedents, requires a plaintiff to use such surveys").  ALS relies on a line of authority holding that a plaintiff may show that a statement is material if it relates to "an 'inherent quality or characteristic' of the product."  *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.*, 284 F.3d 302, 311–12 (1st Cir. 2002) (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)); *see also Cincinnati Sub-Zero Prods., Inc. v. Augustine Med., Inc.*, 800 F. Supp. 1549, 1558 (S.D. Ohio Feb. 26, 1992) (noting that a statement is material if it misrepresented an "inherent quality or characteristic of the product"), *abrogated on other grounds by Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683 (6th Cir. 2000).  ALS argues that because it presented evidence at trial that there is a well-established market for scent-control hunting apparel and that scent control is an important feature in hunting apparel, the jury had an adequate evidentiary basis to conclude that the 40/200 statement was material to consumers.  The Court agrees.  In *Cashmere & Camel Hair Mfrs.*, the court said that it was reasonable to infer that a misrepresentation about the cashmere content of a blazer was material because cashmere is a basic ingredient of a cashmere-blend garment.  284 F.3d at 312.  Here, ALS presented substantial evidence regarding the market for scent-control hunting products and the importance of such products to hunters.  Robinson argues that the cases ALS relies on are at odds with the Sixth

11

Circuit's materiality standard set forth in *American Council*, as well as the Court's instruction on materiality. The Court disagrees. Nothing in *American Council* or, as far as the Court can discern, any case from the Sixth Circuit, suggests that the Sixth Circuit would not embrace the "inherent quality or characteristic" means of proving materiality. Moreover, the jury was instructed that a statement is material if it likely influenced purchasing decisions. Evidence that a statement concerned an inherent quality or characteristic of a product is evidence of a likely influence on purchasing decisions.

The Court reaches a different conclusion with regard to the retailers. The facts that the 40/200 statement concerned an inherent quality or characteristic of Robinson's ScentBlocker products, or that Robinson inundated the retailers with the 40/200 statement, or that the retailers continued to purchase ScentBlocker apparel from Robinson are not sufficient evidence of materiality. Robinson was not a new entrant into the scent-control hunting apparel market; it had sold substantial amounts of scent-control clothing to the retailers for years, and there was no evidence suggesting that, even in the absence of the 40/200 statement, the retailers would not have continued to purchase clothing from Robinson at similar levels or would have purchased more clothing from ALS. Moreover, as previously noted, there were a number of reasons—including the newness of the Trinity fabrics—that might have motivated the retailers' purchase decisions, and in the absence of any evidence from the retailers, the jury lacked a sufficient evidentiary basis to find that the 40/200 statement was material to their purchasing decisions.

### iv.    ALS Failed to Establish Causation

ALS did not present evidence or argue that the 40/200 statement caused any harm at the consumer level. Instead, it focused on harm at the retailer level—lost clothing and fabric sales to Cabela's, lost clothing sales to Gander Mountain, and institution of a buy-back program at Dick's. ALS argues that, because the 40/200 ad specifically targeted ALS's Scent-Lok products, it was

entitled to a presumption of damage.  The Sixth Circuit has followed the lead of other circuits in recognizing a presumption of damages when the defendant's advertising specifically targets the plaintiff's product.  *See Innovation Ventures, LLC v. Bhelliom Enters. Corp.*, 529 F. App'x 560, 566–67 (6th Cir. 2013).  Such presumption may be overcome by evidence of no marketplace injury. *See id.* at 566 (citing *Balance Dynamics*, 204 F.3d at 695).  Robinson contends no presumption is warranted because the 40/200 claim did not target ALS or its products, but instead only mentioned "carbon" and "the competition."  However, some courts have held that a presumption can apply where, "given the nature of the market, it would be obvious to the viewing audience that the advertisement is targeted at the plaintiff, even though the plaintiff is not identified by name." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 148 (2d Cir. 2007).  Regardless, even if the presumption applied, it was rebutted by substantial evidence that the 40/200 claim did not cause ALS harm.

Evidence at trial showed that two factors unrelated to Robinson's advertising were impacting the scent-control clothing market prior to, and during, 2013 and 2014.  First, Under Armour had entered the scent-control hunting clothing space and was having a noticeable impact on the market. For example, in response to a February 2013 survey by ALS, many of ALS's independent salespersons identified Under Armour as a competitive obstacle.  One respondent indicated that Under Armour was beating ALS because Under Armour was "new in . . . the hunting industry and ha[d] inundated it with marketing."  (DX 38.)  Other respondents described Under Armour as the "[e]lephant in the room " and "stiff competition."  (*Id.*)  Even in 2014, a Cabela's representative told ALS that "UA sells" regardless of whether its scent-control clothing worked.  (DX 82.)  The second factor was retailers' increasing preference for  their own in-house brands.  (DX 70 ("Cabela's is moving to 90+% cabelas-branded items"; DX 38 (identifying Under Armour and Cabela's as brands that were taking market share from ALS).)  In fact, ALS contemplated seeking new sales outlets

13

(*e.g.*, Walmart) if its "long term partners [were] not going to support [ALS]."  (DX 38; *see also* DX 95 (August 19, 2014 ALS email stating "Cabelas is really pushing their new Instinct Line and has a big presence in the stores," and that "I wouldn't be surprised at all if that's where sales are going").)

ALS's marketplace injury theory was that Robinson reaped sales that ALS lost due to the 40/200 statement.  That is, absent the 40/200 statement, Cabela's and Gander Mountain would have purchased more Scent-Lok clothing and less ScentBlocker clothing.  However, apart from speculation, ALS offered nothing to support this claim.  ALS witnesses were competent to testify about declining sales, but they provided no insight into the retailers' purchasing decisions.[8]

ALS's sales revenue data, which showed that ALS's sales to all retailers fluctuated yearly, did not necessarily suggest that false advertising caused sales declines in 2013 and 2014.  ALS's sales to Cabela's dropped $1,322,178 from 2011 to 2012; $481,270 from 2012 to 2013; and $9,431 from 2013 to 2014.  (PX 256B.)  Although ALS did lose some Cabela's fabric sales to Robinson in 2013 and 2014, it presented no evidence tying those purchases to a particular ad claim, and its sales revenue data suggests that declines in 2013 and 2014 clothing sales were simply the continuation of a trend that began in 2012—before Robinson introduced the 40/200 statement—possibly as a result of increasing Under Armour/ Cabela's sales or perhaps other factors.  On the other side, Robinson's sales to Cabela's, which were down or flat in 2013 and 2014, did not suggest that Robinson gained clothing sales that ALS lost.  (ECF No. 239 at PageID.2214 (noting that rather than increasing, Robinson's sales to Cabela's declined after 2012).)

As for Gander Mountain, ALS's sales dropped by $428,542 from 2011 to 2012; and by $382,163 from 2012 to 2013, suggesting the continuation of a trend unrelated to the 40/200

---

[8]In a couple of instances, the Court allowed an ALS witnesses to testify about statements by retailer representatives, but only for purposes other than the truth of the matter asserted.

statement.  (PX 256B.)  As with Cabela's, Robinson's 2013 sales to Gander Mountain, which were essentially flat, did not suggest that ALS's lost sales accreted to Robinson.  (ECF No. 239 at PageID.2214.)  And, although ALS was excluded from Gander Mountain for the 2014 season, this was because Gander Mountain decided to sell scent-control clothing only from a single source that year.  (ECF No. 240 at PageID.2577.)  That is, after holding a "beauty contest" (as counsel put it) in which the parties competed on pricing, payment terms, marketing support, and other factors, Gander Mountain chose Robinson.  (*Id.* at 2577–78.)

As for Dick's, ALS did not lose any sales, but claimed that it initiated a guaranteed buy-back program in 2014 in response to Robinson's advertising statements, which resulted in $53,000 in reduced profit for that year.  However, ALS failed to offer any evidence linking the need for this program to any of Robinson's advertising statements.[9]

Noticeably absent from this case, as mentioned above, was any testimony or evidence from the retailers.  The Sixth Circuit has recognized that because allegations of marketplace injury or actual confusion "often require[] that a plaintiff solicit its own customers for affidavits, which puts the customers at risk of being subpoenaed by the defendant[,] [p]laintiffs are justifiably hesitant to alienate or upset their customers in this way." *Balance Dynamics*, 204 F.3d at 692.  This may explain ALS's failure or reluctance to interject retailer witnesses—who could have provided critical testimony—into this case.  Nonetheless, ALS was still required to offer sufficient, competent evidence that Robinson's advertisements influenced the retailers' purchasing decisions.  For example, in *Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379 (5th Cir. 1996), Seven-Up alleged that Coca Cola made misleading comparisons in presentations to eleven bottlers, after which five of them

---

[9]There was no evidence that Dick's demanded or insisted on the buy-back program.  Instead, ALS voluntarily adopted the program to temper the negative effects of Robinson's false advertising.  In the Court's judgment, the buy-back program damages are more akin to damage control expenses rather than marketplace damages.  However, as the buy-back program did not actually respond to Robinson's advertising, they would not be proper damage control expenses.

switched brands.   To establish causation, Seven-Up presented testimony from the bottlers' representatives about how they responded to the presentations.   The jury found that the presentations caused two bottlers to switch to Sprite.   However, the Fifth Circuit concluded that the district court properly granted judgment as a matter of law because one witness said that the presentation did not influence the decision to switch and another witness said that only two questions, both unrelated to the presentation, were asked during the meeting.  *Id.* at 1387–88.   Although Seven-Up argued that it had shown causation because the bottlers' boards voted to switch brands within a short time after witnessing the presentation, the court found that "the surrounding circumstances" showed no causal link between the presentation and the bottlers' decisions.  *Id.* at 1388.

From a plaintiff's perspective, the instant case is even weaker than Seven-Up's case against Coca-Cola.   Not a single customer, *e.g.*, Cabela's, Gander Mountain, nor Dick's, testified at all, much less as to whether:

- the 40/200 statement or any other statement caused it to purchase less clothing from ALS or to purchase some fabric from Robinson instead of ALS;

- any statement played any part in its choice of Robinson as the sole source for scent-control clothing in 2014; or

- that Robinson's statements had even the slightest impact on its decisions.

The Court does not imply that retailer testimony was the only avenue for ALS to prove causation, but no other evidence filled that void.   At bottom, ALS tried its case on a theory of *post hoc ergo propter hoc*, i.e., "after this, therefore because of this."   But even when a presumption arises, "inferences of causation based solely on the chronology of events . . . [will not suffice] where the record contains . . . [evidence of] other equally credible theories of causation."  *Id.* at 1388.  Given the number of potential reasons for ALS's declining sales to Cabela's and Gander Mountain, ALS could not rely on mere temporal sequence to show cause and effect.

16

For the same reasons, the jury's award of Robinson's profits cannot stand.  To sustain such award, there must be "some proof that plaintiff lost sales or profits, or that defendant gained them," because of the false advertising.  *Balance Dynamics*, 204 F.3d at 695.   ALS proved neither.

### c. Bone Collector Expenses

In July 2014, after it filed the instant case, ALS entered into several contracts with Bone Collector, a celebrity hunting group with its own hunting television show, as part of a marketing campaign.  (ECF No. 240 at PageID.2364; ECF No. 233 at PageID.1911.)  The Bone Collector agreements covered a period of five years and called for ALS to pay Bone Collector a total of $5 million.  ALS claimed that the Bone Collector deal was necessary for ALS to effectively respond to Robinson's 40/200 advertisements and asked the jury to award the entire $5 million amount as damage control expenses.  The jury awarded ALS $2 million of the $5 million Bone Collector expenses as damage control expenses.  Robinson argues that this award must be set aside because the Bone Collector contracts were not a necessary corrective measure to address the false advertising.  The Court agrees.  From the beginning of the trial, the Court expressed its misgivings about this item of damages.

Damage control costs are costs incurred in responding to false advertising in order to mitigate potential damage.  *See Balance Dynamics*, 204 F.3d at 689–91; *see also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) (describing damage control measures as "the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads").  In *Balance Dynamics*, the damages included the costs of visiting customers and providing a fact sheet to customers who expressed concern about the defendant's letter.  204 F.3d at 687.  In *Nellcor Puritan Bennett LLC v. Cas Medical Systems, Inc.*, 11 F. Supp. 3d 861 (E.D. Mich. 2014), the court said that the plaintiff's request for an amount of money to conduct a corrective advertising campaign responding to the defendant's alleged false advertising constituted

damage control expenses.  *Id.* at 883.  To be recoverable as damage control costs, corrective measures must be "reasonable under the circumstances and proportionate to the damage that was likely to occur."  *Balance Dynamics*, 204 F.3d at 693.  In other words, damage control expenses are not general image polishing costs.  Rather, they are expenses incurred to correct specific false representations made by a competitor.  For example, Ford could not recover its total advertising costs from Volkswagen if Volkswagen falsely represented the fuel economy of its vehicles.

ALS's contracting with Bone Collectors was pure image enhancement.  ALS did not present any evidence that Bone Collector personnel did anything to respond to Robinson's advertisements.  Although ALS's witnesses testified that ALS entered into the Bone Collector contracts to remedy Robinson's false advertising, ALS's statements at, and prior to, the time of contracting show otherwise.  For example, in January of 2014—seven months before ALS signed the Bone Collector agreements—ALS's then-owner said in an interview with a bow-hunting publication that one of ALS's weaknesses was a lack of celebrities in a "celebrity-centric industry" and that Bone Collector would be a perfect opportunity to address this problem.  (ECF No. 240 at PageID.2374.)  Consistent with that view, one month later, an ALS internal email commented that a "strategic partnership" between ALS and Bone Collector might "have many synergies (from just partnerships to licensing deals) that could build both . . . brands."  (DX 75.)  And, in its July 14, 2014, announcement of the deal to customers, ALS said that the Bone Collector deal would "dramatically change the hunting apparel industry" and that "[s]ynergies from this partnership will be unmatched."  (DX 92.)  Expenses incurred to create "synergies," "build . . . brands," "change . . . [an] industry," and address a company's shortcomings are far beyond the scope of responding to and correcting false advertising.  Thus, by ALS's own admissions, the Bone Collector agreements went far beyond what could reasonably be considered efforts to respond to Robinson's advertising.  Accordingly, ALS may not recover any of the Bone Collector expenses.

### 2. Motion for a New Trial[10]

Robinson also moves for a new trial pursuant to Fed. R. Civ. P. 59. Pursuant to Rule 50(c)(1), because the Court has concluded that Robinson is entitled to judgment as a matter of law, it must also rule on Robinson's motion for new trial in the event that the judgment is later vacated or reversed. The Court concludes that if the judgment entered by this Court is vacated or reversed on appeal, the motion for new trial should be granted because the verdict was against the weight of the evidence.

Rule 59(a)(1)(A) provides that in the case of a jury trial, a court may grant a new trial "for any of reason for which a new trial has heretofore been granted in an action at law in federal court." A new trial is warranted when the jury has reached a "'seriously erroneous result'" as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party. *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996). In ruling upon a motion for new trial on the ground that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. *See Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984). A court must set aside the verdict if it determines that the verdict is against the clear weight of the evidence. *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991) (citing *TCP Indus., inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir. 1981)). However, a court may not set aside a jury verdict simply because the jury could have drawn different inferences or conclusions or because the court believes that another result is more justified. *TCP Indus., Inc.*, 661 F.2d at 546. Instead, the verdict must have been unreasonable. *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 450 (6th Cir. 2005).

---

[10]In light of the Court's ruling on Robinson's motion for judgment as a matter of law, the Court need not address Robinson's request for an equitable reduction of damages under 15 U.S.C. § 1117.

For the reasons set forth above—the lack of evidence that the 40/200 statement deceived a significant portion of retailers, that the statements were material to retailers, and that the retailers relied on any of the statements in their purchasing decisions—the Court concludes that a new trial is required because the verdict is against the clear weight of the evidence.

**B.      ALS's Motions**

ALS has filed three post-trial motions requesting enhanced damages, permanent injunctive relief, and attorney's fees and prejudgment interest.  In light of the Court's ruling on Robinson's post-trial motion, the Court will deny ALS's motion for enhanced damages as moot.  However, because ALS's evidence established that the 40/200 statement has a tendency to deceive consumers, and because Robinson admits that the 8-3-1 and 100/44 statements are literally false, ALS may still be entitled to permanent injunctive relief, *see American Council*, 185 F.3d at 618, as well as attorney's fees.  *See Audi AG v. D'Amato*, 469 F.3d 354, 550–51 (6th Cir. 2006).

**1.      Motion for a Permanent Injunction**

ALS requests a permanent injunction requiring Robinson to:

(1) stop making written or oral false advertising claims of the type proven in this case (*i.e.*, that Trinity adsorbs more odor than carbon); (2) remove the false ad claims from all platforms within its control; (3) send a letter to its pro staff and sales representatives instructing them to stop making those false claims; (4) send a letter to each of its retailer customers, attaching a copy of the jury verdict, and asking them to remove the false 40/200 ad claims from the retailers' own platforms, including websites, hangtags, and stickers affixed to Trinity apparel on their sales floors; and (5) remove any remaining 40/200 hangtags, stickers or signage from retailer sales floors that Robinson, its sales representatives, or its pro staff encounter during in-store visits.

(ECF No. 213 at PageID.1690.)

A party seeking a permanent injunction must show that "(1) it will suffer an irreparable injury absent an injunction; (2) legal remedies, such as money damages, provide inadequate compensation; (3) the balance of hardships warrants an injunction; and (4) the public interest would

not be disserved by an injunction." *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 555 (6th Cir. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006)).

In a Lanham Act case, a likelihood of confusion satisfies the irreparable harm requirement. *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). ALS argues that it has suffered irreparable harm, relying primarily, although not exclusively, on the jury's verdict, which awarded damage control costs, and necessarily relied on a finding that Robinson's statements actually deceived the retailers. ALS further argues that it has suffered irreparable harm because the 8-3-1 and 100-44 ad claims expressly targeted ALS's products and the 40/200 claim was aimed at ALS's carbon products. Robinson responds that ALS cannot demonstrate irreparable harm because Robinson ceased using the 40/200 campaign in mid-2014, and as part of its settlement efforts, it took steps to remove the 40/200 hangtags from clothing in its warehouse and at retailers. Robinson also notes that ALS's ability to quantify its damages for 2013 and 2014, and the facts that it did not seek damages for lost sales in 2015 and 2016 or for injury to its reputation show that ALS is not suffering any injury as a result of Robinson's advertising. Finally, Robinson submits an affidavit from its President, Scott Schultz, detailing a number of steps that Robinson took subsequent to the trial to remove or destroy all remaining references to the 40/200 ad claim. (ECF No. 231.)

Whether ALS has shown irreparable harm is a close call, but the Court concludes that the evidence favors the issuance of some limited injunctive relief. As set forth above, Dr. Maronick testified that consumers tended to interpret the 40/200 statement in a deceiving manner—as referring to the adsorptive capabilities of the product and not merely the technology. Furthermore, in spite of Robinson's efforts, ALS has presented evidence that the 40/200 claim remains in the marketplace, on retailer websites and on products at retail stores. (ECF No. 236 at PageID.2113.) A consumer confronted with a 40/200 hangtag may well believe that the product he is buying adsorbs up to 40%

21

more odor than a carbon-based product, when in fact it does not.  Thus, to the extent these potentially deceiving statements remain in the market, they pose a risk of injury to ALS's business and reputation.

As for an adequate remedy, Robinson argues that ALS has already obtained an adequate remedy.  However, to the extent the 40/200 claim remains in the marketplace, there is a risk of potential harm, and no adequate remedy.  *See Audi AG*, 469 F.3d at 550 ("So long as *www.audisport.com* stayed online, there was potential for future harm, and therefore, there was no adequate remedy at law.")

Finally, the balance of hardships and public interest factors both weigh in favor of injunctive relief.  Robinson admits that it has discontinued its use of the 40/200 ad campaign and has taken some (although possibly not enough) steps to remove it from the marketplace.  Requiring Robinson to contact its retailers to ensure that references to the 40/200 claim are removed from their websites (in instances where the retailer has a website and references to claim remain) and from any in-stock Trinity products on hangtags and stickers, to instruct its outside representatives (salespersons and pro staff) not to refer to or use the 40/200 claim and to remove any references to the 40/200 claim observed during in-store visits, and to take steps to ensure that references to the 40/200 claim are removed from non-retailer hunting-related websites (i.e. www.bowhunting.net)  will not impose an undue hardship on Robinson.  Therefore, the Court will issue limited injunctive relief to ALS.

### 2.    Motion for Attorney Fees

Even though the Court has concluded that ALS is not entitled to money damages, the Court it must still decide whether ALS is entitled to attorney's fees under 15 U.S.C. § 1117(a) because it is awarding ALS injunctive relief.  *See Audi AG*, 469 F.3d at 550–51.  The question, for purposes of § 1117(a) is whether this is an "exceptional case."

The proper test to be applied for exceptional cases under the Lanham Act is currently subject to some uncertainty in the Sixth Circuit. *See Seed v. Jarrow Formulas, Inc.*, No. 3:13-cv-82, 2016 WL 6824401, at *2 (W.D. Ky. Nov. 17, 2016). For years, the Sixth Circuit has held that a case is exceptional only if the violation "was malicious, fraudulent, willful, or deliberate." *Eagles Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004) (internal quotation marks omitted). However, the Sixth Circuit has indicated, but not held, that the "exceptional case" standard the Supreme Court set forth in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, __ U.S. __, 134 S. Ct. 1749 (2014), for cases under the Patent Act may also apply to the Lanham Act's fee-shifting statute. *See Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 318 (6th Cir. 2015) (remanding to the district court to consider whether *Octane Fitness* applies to the Lanham Act). *Octane Fitness* holds that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 134 S. Ct. at 1756. Under this standard, a court may award fees "in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is so exceptional as to justify an award of fees." *Id.* at 1757.

The Court need not decide whether the *Octane Fitness* standard applies because, even under that lower standard, ALS has failed to show that the instant case is exceptional for purposes of § 1117(a).

First, nothing in the record shows that this case stands out from others with regard to the strength of Robinson's defense. Robinson's case was fairly strong. The evidence showed that Robinson spent several years developing an alternative technology to carbon that would allow for lighter, more flexible odor-adsorbing hunting clothing. Robinson tested various synthetic technologies and eventually settled on Macronet. Robinson commissioned Aspen to perform test

A47053, which compared various technologies. Dr. Pearson's undisputed testimony established that the methodology used for A47053 was scientifically valid and the test results were reliable. (ECF No. 240 at PageID.2621.)  While those results showed that both Robinson's and ALS's carbon product adsorbed more odor after 7.5 hours, the first 7.5 hours of the test, which Robinson determined to represent a typical hunting day, supported what later became Robinson's "up to" 40/200 ad claim.  (ECF No. 233 at PageID.2015.)  Robinson's additional in-house calculations, which Dr. Pearson said could be appropriate "normalization" based on fabric weight, provided further support.  And, when Robinson presented the 40/200 statement, it always referred to the technology.  Thus, Robinson presented a sound basis to defend ALS's establishment claim.

Robinson did concede that the 8-3-1 and 100-44 claims were false and that it showed them to retailers in multiple presentations.  But, as discussed above, ALS presented no evidence that those claims were material to, or influenced, the retailer's purchasing decisions.  As for the 40/200 claim, Robinson showed that a significant portion of retailers were not deceived by it and that the 40/200 claim was not material to the retailers' purchasing decisions.  Robinson also presented compelling evidence that ALS's lost sales were caused by factors other than the 40/200 claim and that ALS's claim for damage control expenses based on the Bone Collector contracts was not legally supportable.  In fact, skeptical of its validity, the Court had contemplated dismissing this portion of ALS's case prior to trial.

Finally, Robinson did not litigate in an unreasonable manner.  At most, ALS points to typical discovery hiccups and disputes that often occur in cases of this type, involving tens of thousands (or more) pages of documents.  In addition, substitution of new counsel in the middle of the case's pendency further complicated discovery efforts.  Finally, Robinson conducted the trial in an efficient, effective, and professional manner.  Thus, there is no basis for a fee award.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant Robinson's motion for judgment as a matter of law and alternative motion for a new trial.  The Court will deny ALS's motions for enhanced damages and for attorney's fees and prejudgment interest.  However, the Court will grant ALS's motion for a permanent injunction.

An Order consistent with this Opinion will enter.


Dated:  January 30, 2017                          /s/ Gordon J. Quist
                                                GORDON J. QUIST
                                                UNITED STATES DISTRICT JUDGE